```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2

3      -----------------------------------------------------------
                                    )
       United States of America,    )   File No. 21-cr-268
4                                   )              (SRN-LIB)
              Plaintiff,            )
5                                   )
       vs.                          )   Duluth, Minnesota
6                                   )   March 22, 2022
       Alexia Gah Gi Gay Mary Cutbank )  1:23 p.m.
7      (1), and Mia Faye Sumner (2), )   DIGITAL RECORDING
                                    )
8                                   )
              Defendants.           )
9      -----------------------------------------------------------

10             BEFORE THE HONORABLE LEO I. BRISBOIS
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                        (MOTION HEARING)

12     APPEARANCES
        For the Plaintiff:         U.S. Attorney's Office
13                                 DEIDRE Y. AANSTAD, AUSA
                                   600 U.S. Courthouse
14                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
15
        For the Defendant          Dorsey & Whitney, LLP
16      Alexia Gah Gi Gay Mary     RJ ZAYED, ESQ.
        Cutbank:                   DONNA REUTER, ESQ.
17                                 50 South 6th Street
                                   Suite 1500
18                                 Minneapolis, Minnesota 55402

19      For the Defendant Mia      Office of the Federal Defender
        Faye Sumner:               SHANNON R. ELKINS, ESQ.
20                                 300 South Fourth Street
                                   Suite 107
21                                 Minneapolis, Minnesota 55415

22      Transcriber:               ERIN D. DROST, RMR-CRR
                                   Suite 146
23                                 316 North Robert Street
                                   St. Paul, Minnesota 55101
24

25         Proceedings recorded by digital recording; transcript
       produced by computer.
```

1                              **I N D E X**

                                                                    PAGE

2

     **TRAVIS HEMP**
3       Direct Examination by Ms. Aanstad                            27
        Cross-Examination by Ms. Reuter                              42
4

     **JOSEPH DEJESUS**
5       Direct Examination by Ms. Aanstad                            49
        Cross-Examination by Ms. Elkins                              69
6       Redirect Examination by Ms. Aanstad                          76

7


8


9

     Defense Exhibits                                              REC'D
10        1                                                          71

11   Government Exhibits                                           REC'D
          1                                                          26
12        2                                                          26
          3                                                          26
13        4                                                          26
          5                                                          26

14


15


16


17


18


19


20


21


22


23


24


25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3       (Defendants present)

4

5       THE COURT:  This is the matter of the United

6   States of America v. Alexia Gah Gi Gay Mary Cutbank,

7   21-cr-268(1) and Mia Faye Sumner 21-cr-268(2).

8       Counsel, please note your

9   appearances/representation for the record starting with the

10  Government.

11      MS. AANSTAD:  Good afternoon, Your Honor.  Deidre

12  Aanstad on behalf of the United States.

13      MR. ZAYED:  Good afternoon, Your Honor.  RJ Zayed

14  and Donna Reuter on behalf of Ms. Alexia Cutbank who is here

15  and present before the Court.

16      MS. ELKINS:  Good afternoon, Your Honor.  Shannon

17  Elkins on behalf of Mia Sumner who is seated to my right.

18      THE COURT:  All right.  We have various motions

19  filed for discovery and production subject to order, and

20  then we have a few motions for -- subject to Report and

21  Recommendation.  We're going to take the discovery issues

22  first.

23      You can stay where you are at.  You don't need to

24  worry about the podium.  You can -- the mask requirement

25  is -- no.  You can stay where you are at.  The masks are no

1    longer mandatory, although they are recommended.  So when

2    you're not addressing the Court, it's probably a better

3    idea, given the close proximity that we all have and the

4    limited space here, to continue to use your masks.  When you

5    are arguing and addressing the Court, however, you can

6    remove your mask.

7              The -- I'm going to call them by number as they

8    are related, and then you'll have the opportunity to make

9    whatever additional comments you want to your written

10   submissions.  And then when all the discovery issues are in,

11   then we'll take up the motions that are subject to Report

12   and Recommendation.

13             Docket Numbers 57 and 77 are Defendant Sumner's

14   and Defendant Cutbank's motions to retain rough notes.  The

15   Government has no objection to the preservation of rough

16   notes by agents of law enforcement.

17             Anything anybody else has -- wants to add?

18             MR. ZAYED:  Not on behalf of Ms. Cutbank,

19   Your Honor.

20             MS. ELKINS:  No, Your Honor.

21             MS. AANSTAD:  Nothing from the Government,

22   Your Honor.

23             THE COURT:  All right.  Docket Numbers 53 and 78

24   is Defendant Sumner and Defendant Cutbank's motions for

25   notice of 404(b) materials that the Government intends to

1    introduce at trial.  At the time that the written response

2    was filed, the Government hadn't yet made a decision as to

3    what, if any, 404(b) materials would be offered at trial,

4    but it did acknowledge its obligations and that it will

5    comply.  There's a -- difference here is that Defendant

6    Sumner's motion sought immediate disclosure.  Defendant

7    Cutbank's motion sought four weeks before trial.  And the

8    Government's written response suggested two weeks before

9    trial.

10           So in my eminent wisdom as the learned jurist I

11    am, it's going to be 21 days before trial.  How does that

12    work for everyone?

13           MS. AANSTAD:  No objection, Your Honor.

14           MR. ZAYED:  No objection (inaudible).

15           MS. ELKINS:  No objection.

16           THE COURT:  Okay.  Then Docket Numbers 54, 79, and

17    80 are Defendant Sumner's and Defendant Cutbank's motions

18    for exculpatory materials pursuant to *Brady* and impeaching

19    materials pursuant to *Giglio*.  The Government has indicated

20    in its written response that it's aware of its obligations,

21    has complied with *Brady* to the extent that it has any in its

22    possession, will continue to comply if any becomes

23    available.

24           And with regard to impeaching materials under

25    *Giglio* and its progeny has indicated it will produce -- has

1   offered to produce those materials seven days before trial.

2   Seven business days?

3             MS. AANSTAD:  Yes, Your Honor.

4             THE COURT:  Seven business days before trial for

5   the Government's trial witnesses.  Mr. Zayed?

6             MR. ZAYED:  Thank you, Your Honor.  I would

7   request --

8             THE COURT:  Your mic is not on.

9             MR. ZAYED:  Thank you, Your Honor.  I would

10  request a minimum of three weeks before trial or 15 business

11  days.

12            THE COURT:  Ms. Elkins?

13            MS. ELKINS:  I would join Mr. Zayed's motion,

14  Your Honor.

15            THE COURT:  Any final response, Ms. Aanstad?

16            MS. AANSTAD:  None, Your Honor.

17            THE COURT:  Docket Numbers 56 and 81 are Defendant

18  Sumner and Defendant Cutbank's motions for mandatory early

19  disclosure of Jencks materials.  Both motions seek that

20  mandatory disclosure order requiring the Government to

21  disclose two weeks before trial.  The Government objects on

22  the basis of Eighth Circuit authority but volunteers to

23  disclose any remaining Jencks materials seven business days

24  before trial.

25            Mr. Zayed, Ms. Elkins, any change in the

1     jurisprudence that I have to be reading?

2              MR. ZAYED:  No, Your Honor.  The only thing is

3     that this case is going to be largely witness testimony, and

4     I think providing the materials seven days in advance of

5     trial only may necessitate me seeking a continuance of the

6     trial date because that might not be enough time for me to

7     travel up to Red Lake with my investigators to talk to these

8     various witnesses to the extent they want to talk to me.  So

9     I would -- I know the jurisprudence is that you cannot

10    compel it, but I would ask that you urge the Government to

11    at least provide it 14 days in advance of trial.

12             THE COURT:  Well, the Government's seven business

13    days offers -- depending -- could be nine or ten days,

14    actual calendar days.

15             So, Ms. Elkins, anything you want to add?

16             MS. ELKINS:  No, Your Honor.

17             THE COURT:  Ms. Aanstad?

18             MS. AANSTAD:  Your Honor, given the circumstances

19    of this case, the Government has been generous with seven

20    business days.  As the Court indicated, that could be nine

21    to ten days prior to trial.  The Government is unwilling to

22    move it any further given the circumstances of this case.

23             THE COURT:  All right.  Docket Numbers 55 and 86

24    are Defendant Sumner's and Defendant Cutbank's motion for

25    discovery and inspection, Rule 16(a)(1)(A)

1   through 16(a)(1)(G).  Both motions do seek disclosure of

2   experts pursuant to 16(a)(1)(G), but they don't suggest a

3   timing requirement.  The Government has its own motion for

4   discovery, and somewhat related to this, one of the

5   subparagraphs is for expert disclosure.  The Government is

6   proposing that if you have experts -- I think I'm reading it

7   the right way.  The Government's proposal is that if either

8   side has experts that they intend to introduce in their

9   case-in-chiefs or their defense-in-chief, that they disclose

10  them 30 days before trial and that -- simultaneously, and

11  that any rebuttals to those disclosures would be

12  simultaneously due ten days before trial.  Is that right?

13          MS. AANSTAD:  Correct, Your Honor.

14          THE COURT:  Okay.  If the defense does not have

15  case-in-chief experts, a rebuttal expert would not be

16  challenged as untimely to any of your case-in-chief experts;

17  right?

18          MS. AANSTAD:  No, Your Honor.  As long as it was

19  disclosed ten days prior.

20          THE COURT:  Yeah.

21          MS. AANSTAD:  Yes.

22          THE COURT:  Okay.  All right.  Anything you want

23  to add about the expert issue?

24          MR. ZAYED:  Yes, Your Honor.  I think it should be

25  staggered.  The Government should -- the Government bears

1     the burden, as Your Honor knows.  Defendant has no burden.

2     And so I think if the Government is going to plan on using

3     experts, they need to disclose those experts in sufficient

4     time for me to ascertain whether I need to retain experts

5     and bring them on board to challenge the Government's

6     experts or just to retain an expert to consult with in terms

7     of cross-examining.  So I think it needs to be staggered

8     given that the burden of proof is zero on the defendant and

9     all on the Government.

10             THE COURT:  Well, isn't it effectively staggered?

11     I mean, if -- if you don't want to bring the -- let's call

12     it an affirmative expert or, you know, for -- the Government

13     would disclose their experts 30 days, and you'd have 20 days

14     to review it, retain someone, and then that person would

15     have to be disclosed ten days before.  That's -- they are

16     not requiring you to have a response --

17             MR. ZAYED:  Okay.

18             THE COURT:  -- simultaneous -- you know, on that

19     30th day if it's solely for purposes of rebutting the

20     Government's expert.

21             MR. ZAYED:  I did not appreciate that subtlety,

22     Your Honor.  I understood that the request was that both

23     sides produce their experts 30 days before trial.

24             THE COURT:  Well, if you have -- like I said, to

25     borrow from, you know, civil context, if you have got an

1    expert that's going to assert some sort of affirmative

2    defense as opposed to a rebuttal expert, that would be due

3    30 days.  If it's only rebutting the Government's experts,

4    then it would be due 10 days.

5            MR. ZAYED:  Thank you, Your Honor, for that

6    clarification.  I'm appreciative of that.  I think I would

7    need more than 20 days between the Government's disclosure

8    and disclosing my rebuttal expert, but I appreciate the

9    Court's clarification.  I can live with that if I bring an

10   affirmative expert, not relying on anybody, I would say that

11   that be provided 45 days before trial.  And then the

12   other -- to the extent that I do not 45 days before trial,

13   then maybe 15 days before trial is my rebuttal expert.

14           THE COURT:  Ms. Elkins?

15           MS. ELKINS:  I think that sounds reasonable,

16   Your Honor.  I understand that both of these women are going

17   to be facing very significant sentences in this case and

18   that it's not the run-of-the-mill case.

19           THE COURT:  We don't have a trial date obviously

20   yet.  And because of the dispositive motions subject to R&R,

21   it won't be set any time soon.  So -- or, at least, you

22   know...

23           Ms. Aanstad, any last remark?

24           MS. AANSTAD:  Your Honor, I'd only note that this

25   case isn't built upon expert testimony.  Any expert

1  witnesses that may be called, the substance of their

2  testimony has already been disclosed in the form of geofence

3  warrants and the results of those geofence warrants, as well

4  as any, I guess, minimal BCA, Bureau of Criminal

5  Apprehension, forensic analysis.  So I don't anticipate it

6  being a heavy list.  So if the Court orders 45 days and

7  15 days, that's fine with the Government.

8           THE COURT:  Docket Numbers 76 and 83 are the

9  Defendant Sumner and Defendant Cutbank's motions for

10  disclosure of grand jury transcripts.  The Defendant

11  Sumner's motion on its face was limited to disclosure of

12  witnesses appearing today.  Defendant Cutback's -- Cutbank's

13  motion, I read it to be both witnesses today and anybody

14  who's appeared at a grand jury in this case.  The Government

15  seems to have read both motions as to hearing and trial

16  witnesses.  So we've got three different interpretations.

17           Mr. Zayed, anything you want to add?

18           MR. ZAYED:  Yes, Your Honor.  To the extent that

19  it's all -- if a witness testified before the grand jury and

20  is not going to be called at the motions hearing or at

21  trial, then I withdraw that portion of it.  But I maintain

22  my motion as to any witnesses --

23           THE COURT:  Okay.

24           MR. ZAYED:  -- who testified -- who will testify.

25           THE COURT:  Ms. Elkins?

1             MS. ELKINS:  I just maintain my motion,

2     Your Honor.

3             THE COURT:  So --

4             MS. ELKINS:  I don't believe anyone today that's

5     testifying testified at the grand jury.

6             MS. AANSTAD:  That's correct, Your Honor.

7             THE COURT:  And that was going to be my question.

8             MS. AANSTAD:  Your Honor, neither officer that is

9     testifying today has testified at the grand jury.

10            THE COURT:  Okay.  One of the things that was in

11    the Government's response was that, you know, obviously

12    subject to *Brady* obligations, which would trump the Jencks

13    Act, any grand jury testimony would be -- relative to a

14    trial witness, the Government would produce that at the same

15    time as the seven business days --

16            MS. AANSTAD:  Correct, Your Honor.

17            THE COURT:  -- discussion we already had?

18            MS. AANSTAD:  Yes, Your Honor.

19            THE COURT:  Okay.  All right.  Docket Number 84

20    and Docket Number 95 is Defendant Cutbank's motion for

21    disclosure of confidential informants, and I reference

22    Docket Number 95 as somewhat related.  It's Defendant

23    Sumner's motion for disclosure of post-conspiracy

24    co-defendant or unindicted co-conspirator statements since

25    it's, I guess, possible that that could also be an

1    informant.  So -- and I think, Ms. Elkins, 95 is the one

2    that in the status conference that the Court held with

3    counsel for all parties prior to this hearing that you

4    wanted to address?

5              MS. ELKINS:  Yes, Your Honor.

6              THE COURT:  Okay.  Mr. Zayed, anything you want to

7    add to your motion, Docket Number 84?

8              MR. ZAYED:  No, Your Honor.

9              THE COURT:  Ms. Aanstad, anything specific to 84

10   that you want to add?

11             MS. AANSTAD:  No, Your Honor.

12             THE COURT:  Okay.  Ms. Elkins?

13             MS. ELKINS:  May I approach the podium?

14             THE COURT:  If you wish.

15             MS. ELKINS:  Your Honor, as to my motion, there's

16   a couple of issues.  I received the search warrant for the

17   Facebook accounts on Thursday of last week.  And in my

18   review of that, there appear to be confessions made by

19   Ms. Cutbank and Ms. Sumner to different people at various

20   times after the conspiracy.

21             THE COURT:  Whose Facebook account?

22             MS. ELKINS:  The search warrant is for both of

23   their Facebook accounts.

24             THE COURT:  Okay.

25             MS. ELKINS:  And the Facebook accounts of many

1     people.  That, I believe, is Government Exhibits 2 and 3.

2               THE COURT:  Okay.

3               MS. ELKINS:  But within the text and within the

4     affidavit, Cutbank makes some confessions to someone who I

5     believe is named Victoria Becerra, B-e-c-e-r-r-a, via

6     Facebook somewhat admitting some involvement, somewhat

7     putting other people present.

8               Then Ms. Sumner allegedly confesses to Victoria

9     Becerra on September 24th, 2019, after Ms. Becerra had

10    visited Ms. Sumner in the Northwest Juvenile Correction

11    Center in Bemidji.

12              So within the Government Exhibit 2, we have some

13    problematic confessions that could possibly be admissible

14    against one defendant but would not be admissible against

15    the other defendant.  This creates a *Bruton* issue.  So we

16    are asking for Ms. Becerra's statements that she has made to

17    law enforcement or others regarding alleged confessions of

18    Ms. Sumner, her co-defendants, or any unindicted

19    co-defendants.

20              I also have reason to believe, Your Honor, that

21    there are other confessions out there made by Ms. Sumner's

22    co-defendants that would be inadmissible as to her.  I have

23    been told that if there were any of those statements that

24    were exculpatory, that Ms. Aanstad would have given them to

25    me already under *Brady* and *Giglio*.  But I am concerned about

1    the amount of witness testimony and what co-conspirators or

2    unindicted co-conspirators might have said after the offense

3    date because the case is largely built on that, which I

4    think creates a unique *Bruton* issue in this case.  And I'm

5    not looking for full Jencks discovery.  I'm just looking for

6    confessions of co-defendants or unindicted co-conspirators.

7    So that's Document 95.

8              And as far as 96, the motion to sever defendants,

9    I know that you haven't mentioned that yet, but I would ask

10   for leave -- I can waive that motion at this time since it

11   seems too early, and perhaps I can take that up with Judge

12   Nelson after I receive some of the *Bruton* statements because

13   maybe it would be more appropriate at that time.

14             THE COURT:  All right.  Docket Number 96 is

15   withdrawn without prejudice.

16             Wait.  I have a question.

17             MS. ELKINS:  Oh, sorry, Your Honor.

18             THE COURT:  That's okay.  So just so I understand,

19   the scope of the disclosures you're seeking isn't the whole

20   universe of anything that the Government might use at trial.

21   It's if a -- someone other than an indicted defendant or --

22   I guess it would include the co-defendants.  It would be the

23   co-defendants and anyone who is not indicted but has said

24   something against their penal interests; is that right?

25             MS. ELKINS:  Um --

1        THE COURT:  At this time you're not looking for

2    anything that would be inculpatory that they said about

3    someone else?  I mean, *Brady* is different, but --

4        MS. ELKINS:  Yes.

5        THE COURT:  -- what I understood you to say was if

6    a co-defendant has subsequently confessed or if an

7    unindicted co-conspirator also subsequently confessed,

8    that's why I'm saying it's against their penal interests.

9        MS. ELKINS:  Correct.

10       THE COURT:  As opposed to they are saying

11   something that, you know, Ms. Sumner did that may be subject

12   to disclosure at a later date if they are going to be a

13   trial witness or not?

14       MS. ELKINS:  That's correct.  I agree, Your Honor.

15   I think the latter would be Jencks.

16       THE COURT:  Yeah.

17       MS. ELKINS:  But what I'm asking for is much more

18   in line with the ruling in *Bruton*.

19       THE COURT:  Okay.  All right.

20       Ms. Aanstad, with regard to that limited clarified

21   scope, do you want to address that?

22       MS. AANSTAD:  Quite candidly, Your Honor, I'm not

23   quite sure what defense counsel is requesting.  The

24   Government is aware of its obligations with respect to *Brady*

25   and *Giglio* and has and will continue to make those

 1   disclosures.

 2          With respect to *Bruton* and disclosure under

 3   *Bruton*, it isn't a requirement that the Government open its

 4   discoverable file at a given time as long as the Government

 5   is complying with *Brady* and *Giglio*.  And the Government has

 6   done that.

 7          *Bruton* statements are treated no differently than

 8   Jencks Act material, and so it's the Government's position

 9   that defense counsel is not entitled at this point in time

10   to post-conspiracy statements or co-conspirator statements.

11   Those that are alleged or that are being identified in a

12   search warrant is not -- I guess -- well, I'll tackle first

13   the issue with respect to it might be neither here nor

14   there, but I have heard now a couple of times that defense

15   counsel just received discovery last week with respect to

16   these materials, but discovery was made in accordance with

17   the Court's order and all of these materials were available

18   at that time.  So now to hear that there are issues with

19   respect to discovery and with respect to disclosures, the

20   Government has disclosed all materials that are required

21   under Rule 16.  The Government has made further disclosures

22   because of the complexities of this case that include

23   statements from some individuals that were at the scene of

24   the homicide on August 12th, 2019.  Additionally, the

25   Government has made disclosures of some co-conspirator

1    statements.  However, *Bruton* does not -- again, is not an

2    end run around disclosure and requirements under Jencks and

3    other rules of discovery, so the Government would object to

4    disclosure at this point in time for *Bruton* purposes.

5              THE COURT:  Ms. Elkins, any last comment?

6              MS. ELKINS:  No, Your Honor.

7              THE COURT:  Docket Numbers 89 and 90 are the

8    Government's motion for discovery directed to Defendant

9    Cutbank and Defendant Sumner, and they are identical.

10   There's no written response to them.  I'm assuming, though,

11   Mr. Zayed, that you have seen it?

12             MR. ZAYED:  Yes, I have, Your Honor.

13             THE COURT:  Any objections?

14             MR. ZAYED:  No objections, Your Honor.  We

15   understand our obligations to the extent they apply.

16             THE COURT:  Ms. Elkins, have you seen it?  Docket

17   90?

18             MS. ELKINS:  The Government's motion, Your Honor?

19             THE COURT:  Yes.

20             MS. ELKINS:  Yes, I have.  And I have no

21   objections.

22             THE COURT:  Okay.  And we've already addressed the

23   expert disclosure issue, and the Government has indicated it

24   wouldn't object to modifying that to be 45 days for

25   case-in-chief disclosure and 15 days before trial for

1    rebuttals by either side thereto.

2              MS. AANSTAD:  Yes, Your Honor.

3              THE COURT:  Okay.  That's all the discovery

4    motions, I believe.  Have I missed any?  I know I missed one

5    in the status conference, but I think I've got them all now.

6    Ms. Elkins?

7              MS. ELKINS:  I don't believe so, Your Honor.

8              THE COURT:  Mr. Zayed?

9              MR. ZAYED:  I think you covered them all,

10   Your Honor.  Thank you.

11             THE COURT:  Ms. Aanstad?

12             MS. AANSTAD:  I think you covered them.

13             THE COURT:  Okay.  Then before we get into the

14   evidentiary portion, the Docket Number 96, Defendant

15   Sumner's motion to sever has been withdrawn without

16   prejudice pending further prep prior to trial.

17             Mr. Zayed, Ms. Cutbank has a motion to sever at

18   Docket Number 82.  Do you want to follow Ms. Elkins' lead?

19             MR. ZAYED:  No, Your Honor.  I would persist in

20   maintaining that motion because the issue that's

21   antagonistic here is using the confession of a co-defendant

22   at trial, which inexorably points the finger at Ms. Cutbank.

23   And so I don't believe that defenses -- I think the defenses

24   are antagonistic.  I think the confessions of co-defendants,

25   which indirectly implicate -- I mean, *Bruton* stands for the

1    proposition that says, I, along with X, went and did this.

2    And as long as you redact -- put X instead of the person's

3    name, that's generally allowed.  But I think that's not

4    proper here, because when you say I and X did something,

5    there's only one X, and that points inextricably and

6    inexorably to Ms. Cutbank, and I don't think that she

7    would -- because of the antagonistic defenses, I think that

8    this case needs to be severed such that Ms. Cutbank is not

9    facing, indirectly, out-of-court statements that are

10   implicating her, and I believe that's a due process

11   violation.  So I persist in my motion to sever.

12              THE COURT:  Ms. Aanstad?

13              MS. AANSTAD:  Your Honor, I would rest on my

14   response in the Government's consolidated response in this

15   matter.  I think -- I was taking a moment to think about all

16   of the statements in this case, and given the circumstances,

17   I think it's premature to rule on a motion to sever with

18   respect to each of the defendants.  Additionally, as is

19   outlined in my response, simply because someone made a

20   statement does not automatically require severance.  There

21   are curative instructions that can be provided, as well as

22   defense counsel has already pointed out there can be

23   sanitized statements that are provided to the jury.  So the

24   Government's position in this case is that, first, that the

25   motion can be denied outright; alternatively, that it's

 1    premature.

 2              THE COURT:  All right.  Mr. Zayed, you're

 3    submitting it on the four corners of Docket Number 82 or did

 4    you want to brief it?

 5              MR. ZAYED:  My brief wouldn't be anything more

 6    than what I provided the Court here.

 7              THE COURT:  Okay.  All right.  Okay.  Then that

 8    leaves Docket Number 87, Defendant Cutbank's motion to

 9    suppress search and seizure.  At the status conference prior

10    to this hearing at which counsel for all parties were

11    present, the search warrants that apparently that are at

12    issue are two warrants for Facebook accounts which are

13    subject to being submitted for four corners review.

14    However, even though there would be no testimony on it, you

15    did want to brief the Facebook warrants; right?

16              MR. ZAYED:  Yes, Your Honor.

17              THE COURT:  Okay.

18              MR. ZAYED:  On behalf of Ms. Cutbank, yes.

19              THE COURT:  Okay.  And then there's a search

20    warrant for a premises in the Cass Lake area issued or

21    executed apparently by the Leech Lake Tribal Police.  That's

22    the third warrant -- search warrant subject to your motion;

23    correct, Mr. Zayed?

24              MR. ZAYED:  That's correct, Your Honor.

25              THE COURT:  Okay.  And there -- Ms. Aanstad, there

```
 1    will be one witness on that third warrant; right?
 2              MS. AANSTAD:  Correct, Your Honor.
 3              THE COURT:  Okay.  And that will be who?
 4              MS. AANSTAD:  That is Sergeant Travis Hemp.
 5              THE COURT:  Hintz?
 6              MS. AANSTAD:  Hemp, H-e-m-p.
 7              THE COURT:  Hemp.
 8              Docket Number 88 is Defendant Cutbank's motion to
 9    suppress statements.  However, Mr. Zayed, I understand
10    there's a record relative to that you want to make prior to
11    withdrawing it?
12              MR. ZAYED:  Yes, Your Honor.  The record is that
13    the Government has agreed not to use any statements in its
14    case-in-chief, however, it reserves the right to use such
15    statements for impeachment purposes should Ms. Cutbank
16    decide to testify at trial.  Given those representations, we
17    withdraw that motion.
18              THE COURT:  Ms. Aanstad?
19              MS. AANSTAD:  Your Honor, that is correct.  I just
20    want to clarify that it's any statements made to law
21    enforcement.  There were two instances where statements were
22    attempted or law enforcement went and spoke with the
23    defendant, Defendant Cutbank, and in both of those, no
24    statements were obtained.  So it is those two statements
25    that the Government is agreeing it will not use in its
```

1    case-in-chief, but there may be impeachment material should

2    we go to trial and the defendant testify.

3                THE COURT:  Mr. Zayed?

4                MR. ZAYED:  That is correct, Your Honor.  By

5    "statements," I was definitely referencing the statements

6    made to law enforcement which would be subject to a motion

7    to suppress.  That's correct.

8                THE COURT:  Okay.  All right.  Docket Number 58 is

9    Defendant Sumner's motion to suppress statements -- or

10   statement, I guess.  And it -- the motion papers identified

11   it as one made on August 19th, 2019.  But it's been

12   clarified that it was actually shortly after midnight on

13   August 20th, 2019?

14               MS. ELKINS:  Yes, Your Honor, in the early a.m.

15   hours.

16               THE COURT:  Yeah.

17               MS. AANSTAD:  Yes, Your Honor.  It was between

18   2:30 and 3:00 a.m.

19               THE COURT:  Okay.  And one witness for that?

20               MS. AANSTAD:  Yes, Your Honor.

21               THE COURT:  And that would be who?

22               MS. AANSTAD:  That is Sergeant Joseph Dejesus from

23   the Duluth Police Department.

24               THE COURT:  All right.  We might as well do the

25   admin stuff here.  Mr. Zayed wants to brief the search

1   suppression issue; and then as it relates to the Facebook

2   warrants, I imagine he wants to brief the search suppression

3   as it relates to the Leech Lake warrant.

4           Ms. Elkins, you want to brief the suppression of

5   statements issue, I'm assuming?

6           MS. ELKINS:  Yes, Your Honor.

7           THE COURT:  Okay.  Mr. Zayed, Ms. Elkins, is it

8   your intention to order a transcript or brief off the basis

9   of just today?

10          MS. ELKINS:  I would order the transcript,

11  Your Honor, and we'd ask for a two-week transcript.

12          THE COURT:  14-day transcript?  Okay.  How long

13  after receipt of the transcript?  Mr. Zayed?

14          MR. ZAYED:  I think two weeks is sufficient,

15  Your Honor.

16          THE COURT:  Ms. Elkins?

17          MS. ELKINS:  That works for me, Your Honor.

18          THE COURT:  And, Ms. Aanstad, how long after

19  receipt of the -- all the defense briefing?

20          MS. AANSTAD:  Two weeks later, Your Honor.

21          THE COURT:  All right.  All right.  Then are

22  there -- obviously there's some written exhibits relative to

23  the search warrant issues.  Do you want to -- have you

24  shared those with Mr. Zayed?

25          MS. AANSTAD:  Yes, Your Honor.  If I may,

 1    Your Honor, the Government has previously provided

 2    Government Exhibits 1 through 4.  The Government does have

 3    an additional exhibit now, Government Exhibit 5.  I would

 4    note for the record that Government Exhibits 1 through 3

 5    pertain to Defendant Cutbank's motion to suppress.  Those

 6    are the three search warrants; two Facebook, and one Leech

 7    Lake Police Department premises warrant.  My understanding

 8    is that there is an agreement that those could be submitted

 9    on the record.

10             Additionally, with respect to Ms. Sumner's motion,

11    Motion Number 58, the body camera, which is Government

12    Exhibit 4, and then a map, which is Government Exhibit 5,

13    those exhibits also are -- defense counsel is agreeing to

14    stipulate to, and so the Government would move to offer at

15    this time Government Exhibits 1 through 5.

16             THE COURT:  Mr. Zayed, any objections to

17    Government Exhibits 1 through 3 as it relates to your motion

18    to suppress search?

19             MR. ZAYED:  No objections, Your Honor.

20             THE COURT:  Okay.  Ms. Elkins, any objection to

21    Government Exhibits 4 through 5 as it relates to your motion

22    to suppress statements?

23             MS. ELKINS:  No, Your Honor.

24             THE COURT:  All right.  Government Exhibits 1

25    through 5 are admitted for purposes of this hearing.  I've

1       got them in advance.

2                   MS. AANSTAD:  Your Honor, I don't believe you have

3       Government Exhibit 5 or Government Exhibit 4, which was the

4       body camera, so if I can approach the Court?

5                   THE COURT:  Yeah.  But I have 1 through 3 already?

6                   MS. AANSTAD:  Yes.

7                   THE COURT:  Yeah.

8                   MS. AANSTAD:  I have made copies.

9                   THE COURT:  Okay.  All right.  Are you going to be

10      publishing the body camera today during the hearing?

11                  MS. AANSTAD:  No, Your Honor.

12                  THE COURT:  Okay.  Ms. Elkins, are you going to

13      need it?

14                  MS. ELKINS:  No, Your Honor.

15                  THE COURT:  Okay.  All right.  All right.  Then

16      why don't we call Officer Hemp first.

17                  MS. AANSTAD:  Thank you, Your Honor.  And if it's

18      all right, I'll stand at the podium?

19                  THE COURT:  Yeah.

20                  Please face the courtroom marshal and be sworn.

21                  THE COURTROOM DEPUTY:  Please raise your right

22      hand.

23          (Witness Sworn.)

24                  THE COURTROOM DEPUTY:  Please state your full name

25      and spell your last name.

1          THE WITNESS:  Travis James Hemp, H-e-m-p.

2          THE COURTROOM DEPUTY:  Okay.  Thank you.

3          THE COURT:  Please have a seat.  And then once

4    seated, please remove your mask so that the defendant may

5    avail herself of her full rights of confrontation.

6          Ms. Aanstad, you may inquire.

7          MS. AANSTAD:  Thank you.

8                        **(Travis Hemp)**

9                     **DIRECT EXAMINATION**

10   BY MS. AANSTAD:

11   Q.  Sergeant Hemp, where are you currently employed?

12   A.  Leech Lake Tribal Police.

13   Q.  How long have you been employed there?

14   A.  Since 2005.

15   Q.  In what capacity are you currently working with the

16   Leech Lake Police Department?

17   A.  A police sergeant.

18   Q.  How long have you been a sergeant?

19   A.  Since 2017.

20   Q.  Now, as a sergeant, describe your duties, please.

21   A.  I also work the road, take calls.  I also make sure the

22   guys get all their reports done and supervise all the

23   officers for two shifts.

24   Q.  And do you work a particular shift when you are working

25   as a sergeant?

1    A.  I work night shift.

2    Q.  And what time is that night shift?

3    A.  So I go to work at 6:30 p.m. and then get off at --

4    eleven and a half hours later.

5    Q.  And have you been working that same night shift since

6    you became a sergeant?

7    A.  Yes, for the most part.  Sometimes it varies a little

8    bit, a couple hours here and there.

9    Q.  Okay.  Now, were you working during the evening into the

10   early morning hours of August 5th, 2019?

11   A.  Yes.

12   Q.  In working for the Leech Lake Police Department, what

13   are your jurisdictional boundaries on where you can patrol?

14   A.  The whole reservation, which is approximately

15   1,100 square miles.

16   Q.  Now, while you were working on August 5th of 2019, were

17   you in a squad car?

18   A.  Yes.

19   Q.  Do you have any partner that rides along with you?

20   A.  No.  I -- we all have our own squads.

21   Q.  Okay.  And you're in uniform when you are in your squad?

22   A.  Correct, yes.

23   Q.  Did you receive a call or overhear a dispatch to the

24   Cedar Lakes Casino in the early morning hours of August 5th,

25   2019?

1    A.  Yes.

2    Q.  Describe what you heard with the dispatch.

3    A.  We were dispatched that a male -- surveillance and

4    security called us and stated that a male dropped two 57

5    rounds -- .357 rounds in the front entryway.

6    Q.  And when you are in your patrol car, can you hear all

7    dispatch calls?

8    A.  For the most part, correct.

9    Q.  Is someone specifically assigned, an officer

10   specifically assigned, or is it whoever is closest?

11   A.  Who's ever closest.

12   Q.  Now, you said you heard from the security.  That would

13   be from the Cedar Lakes Casino and Hotel?

14   A.  Correct.  They are the ones who call our dispatch.

15   Q.  Now, if you can, for the Court, please describe the

16   Cedar Lakes Casino and Hotel.

17   A.  It's the -- well, that was before.  It just opened.  It

18   was a soft grand opening.  So it wasn't -- it was pretty

19   much brand new.  It was just getting opened.  And it's right

20   there on -- right off Highway 2 right in Cass Lake.  It's a

21   hotel -- it's a four-story hotel with the casino attached.

22   Q.  And when you say it was a soft opening, it was during

23   that time, August 5th, 2019?

24   A.  Correct, yes.

25   Q.  And so there was a dispatch about ammunition that was

1    found by security?

2    A.  Yes.

3    Q.  And what did you do when you overheard that as you're in

4    your squad car?

5    A.  We were requested to respond to the back entryway, the

6    employee entrance, to meet with security, and that's where

7    we responded.

8    Q.  Were you the first officer on scene?

9    A.  No, I was not.

10   Q.  How many officers responded to that ammunition call?

11   A.  Two at that time because we only had two in the area.

12   Q.  And so yourself being one of them?

13   A.  Correct.

14   Q.  Who else responded with you?

15   A.  Officer Oelke.

16   Q.  And can you spell Oelke for the record, please?

17   A.  O-e-l-k -- I'm trying to think -- -e?  He hasn't worked

18   for us a couple years now.

19   Q.  Okay.

20   A.  But, no, I can't recall it.

21   Q.  Thank you.  Now, once you arrived, so you went to that

22   back door -- is that correct? -- of the -- that security

23   directed you to?

24   A.  Correct.

25   Q.  And what happened once you arrived there?

1    A.  They met with security, and they explained to us at that

2    time that -- what they found.  And that surveillance was

3    still watching the male, and he was in the food court at

4    that time.

5    Q.  Now, what was going to be your role in the investigation

6    since Office Oelke was there as well?

7    A.  Just supervise and make sure everything was being done

8    and assist him if he needed any assistance.

9    Q.  What happened -- let me back up for a second.  Do you

10   remember what time it was in the morning hours of August 5th

11   that you arrived at the casino?

12   A.  Right around 2:00 a.m.

13   Q.  Now, what did you do once you learned information that

14   that male individual that security had been following, that

15   he was in the food court?  What did you do?

16   A.  We went out and made contact with the male.

17   Q.  And that's both you and Officer Oelke?

18   A.  Yes.

19   Q.  What happened when you made contact with that male?

20   A.  We made contact with him, advised him of what we had,

21   and then we escorted him to a private room so we could talk

22   to him because it's noisy in the casino and they have

23   separate, like, conference rooms.  So we brought him in

24   there, and that's where we conducted our investigation with

25   him.

1    Q.  Now, ultimately was that male individual, were you able

2    to identify where he had come from in the hotel?

3    A.  Later they told us.  Surveillance advised us that he

4    came from Room 445.

5    Q.  And how long were you at the Cedar Lakes Casino that

6    evening or in the early morning hours?

7    A.  I believe I arrived at the casino right around

8    2:00 a.m., and I left the casino that morning.  I don't

9    remember.  It was probably 10:00 a.m. to probably 11:00 a.m.

10   Q.  Okay.  So you were speaking with the male individual in

11   a conference room or in a room that security had provided to

12   you; is that correct?

13   A.  Correct.

14   Q.  And the casino security, were they involved in the

15   investigation as well?

16   A.  They just stand by.  They don't really -- a lot of our

17   information we get is from the surveillance footage.

18   Q.  And as your investigation continued dealing with this

19   male, you learned that he came from Room 445?

20   A.  Correct.

21   Q.  And that's within the hotel?

22   A.  Yes.

23   Q.  That's connected to the casino?

24   A.  Correct.

25   Q.  Now, what did you do once you learned that the male had

1    come from Room 445?

2    A.   At that time during the investigation, we also found

3    other narcotics on the male, which led to his arrest.  So at

4    that time, we were dealing with that incident, and security

5    was asking for assistance because they wanted to kick

6    everyone out of the room in 445 due to their policies.

7    Q.   And the policies being what?

8    A.   No firearms, no drugs on the property.

9    Q.   And so security indicated to you and Officer Oelke that

10   they were going to remove individuals from Room 445?

11   A.   Correct.

12   Q.   And did you, in any way, assist security with dealing

13   with evicting or kicking out people from Room 445?

14   A.   They asked me to go up there for assistance due to the

15   fact that there was possibly maybe a firearm in the room and

16   they just wanted me up there, so I followed them up there in

17   case things got out of control.

18   Q.   So when you say that there might have been a firearm,

19   why did security believe that there might be a firearm in

20   the hotel room?

21   A.   Because the male Johnson we had contact with earlier had

22   ammunition on him.

23   Q.   Now, you talked a little quickly, but I believe you said

24   that a male Johnson?

25   A.   Yeah.

1    Q.  And so you were able to identify and ultimately arrest

2    the individual that you and Officer Oelke first started

3    dealing with; is that correct?

4    A.  Correct.

5    Q.  And that individual was Molandas Johnson?

6    A.  Correct.

7    Q.  Now, you didn't know Molandas Johnson prior to that

8    night, did you?

9    A.  No.

10   Q.  And when security -- after a period of time, casino

11   security decided that they were going to go to Room 445?

12   A.  Correct.

13   Q.  And you went along with?

14   A.  Yes.

15   Q.  Was there any other officers that went along?

16   A.  No.

17   Q.  And why did you go along then to Room 445?

18   A.  To assist security with making sure -- to kick the -- if

19   there was anyone in the room, to remove them.  And they

20   stated there should be no one else in the room.

21   Q.  Now, at the time -- at the time that you went to Room

22   445, do you wear a body camera?

23   A.  I do, yes.

24   Q.  Was your body camera operational at that time?

25   A.  No, not at that time.

1    Q.  Why not?

2    A.  The battery died.

3    Q.  How long had you been at the casino at that point when

4    you went to Room 445?

5    A.  Approximately an hour and a half.

6    Q.  So it was about 3:30 a.m. that you went to Room 445?

7    A.  Correct.

8    Q.  What happened when you and security went to Room 445?

9    A.  They knocked on the door, and they were unable to get

10   anyone to come to the door.  And at that time, they opened

11   the door and they went in.

12   Q.  And what did you do?

13   A.  I stood out the door.

14   Q.  Now, did you have your gun drawn?

15   A.  No.

16   Q.  Why didn't you go inside?

17   A.  Why didn't I go inside?

18   Q.  Right.

19   A.  Because normally security goes in.  If there was no one

20   in there, then that's it.  That's what we do.

21   Q.  Okay.  What happened when security went into the hotel

22   room?

23   A.  They advised me that there was drug paraphernalia all

24   over the countertop and then the table.

25   Q.  If you can for the Court, please describe what Room 445

1    looks like at the Cedar Lakes Casino.

2    A.  When you first walk in the hotel room -- it's a suite.

3    So when you first walk in, there's -- right to the right

4    area, there's like a kitchen area and it's got a table.  And

5    then there's like a full-size fridge and a sink.  And to the

6    left of that is a couch -- two couches, I believe, and then

7    there's a fireplace and then there is a door going out to

8    the balcony.  And then beyond that, if you keep going just

9    straight as you come in, that would be where the bedroom

10   door was.

11   Q.  And there's a door between the bedroom and the living

12   area of this suite?

13   A.  Correct, yes.

14   Q.  And were you able to -- as you're standing in the

15   doorway, are you looking into the hotel room?

16   A.  Correct.

17   Q.  Are you able to see anything as security is telling you

18   that there's paraphernalia?

19   A.  Yes, I could see the stuff that was on the table on the

20   right side coming in just because they were pointing it out

21   to me.

22   Q.  And that would be the kitchen table?

23   A.  Correct, yes.

24   Q.  And what did you see on the table that looked like

25   paraphernalia to you?

1    A.  If I recall, I believe it was some gloves and then some

2    tinfoil and some just miscellaneous stuff.

3    Q.  What happened -- at that -- well, let me ask:  At that

4    point in time when casino security was telling you what they

5    were seeing and you could look in and see it, what did you

6    do?

7    A.  Well, at that time I was -- they -- at -- once they

8    pointed that out, they went and checked the bedroom, the

9    back bedroom.  And that's when they found a female -- or a

10   male and a female in the back bedroom.

11   Q.  Had you crossed the threshold and were you in the hotel

12   room at that point in time?

13   A.  Not until they found the male and the female in the

14   bedroom that were unresponsive.

15   Q.  And so explain that a little bit.  What did casino

16   security find?

17   A.  They found a female laying in a bed and then a male at

18   the end of the bed, and they were unable to get them to

19   respond or wake up.

20   Q.  And at that time, you were still outside the hotel room?

21   A.  Correct.

22   Q.  What did you do -- well, casino security relayed that

23   information to you?

24   A.  Yep.

25   Q.  And what did you do in response to that?

1    A.  I went in to see if I could assist them medically with

2    it because I'm a first responder.

3    Q.  And what happened?  You made entry into the casino --

4    or, excuse me, into the hotel room?

5    A.  I made entry right straight into the bedroom at that

6    time.

7    Q.  And what happened once you got into the bedroom?

8    A.  When I was trying to re -- help get the male and female

9    to respond, I noticed there was drug paraphernalia on the

10   floor, a hypodermic needle and a glass smoking device.

11   Q.  And what did you do after you made those observations?

12   A.  I continued with the medical part.  I was able to get

13   both the male and the female to respond with a sternum rub.

14   Q.  On both of them?

15   A.  Correct.

16   Q.  And what happened once you were able to arouse both the

17   male and female?

18   A.  Security advised them they had to leave.  I only had

19   contact with the male at that time and security dealt with

20   the female and advised them they had to leave at that time.

21   Q.  And what happened to that male and female?

22   A.  They both left.

23   Q.  Left the casino?

24   A.  I believe so, yes, because I stayed -- at that time, I

25   stayed in the room and contacted an investigator.

1    Q.  Why did you stay in the room and contact an

2    investigator?

3    A.  Just due to the drug paraphernalia that I seen.

4    Q.  Why was that critical that you contact the investigator?

5    A.  To see if they wanted us to hold the room for a search

6    warrant or not.

7    Q.  So let's talk again about the paraphernalia that you had

8    seen.  It was on the kitchen table when you first walked in?

9    A.  Correct.

10   Q.  And that was something that you could see as security

11   was walking through the door?

12   A.  Correct.

13   Q.  And you were still outside?

14   A.  Yes.

15   Q.  You also said that you saw a hypodermic needle on the

16   floor next to the bed?

17   A.  Correct, yes.

18   Q.  And did you pick up anything while you were in the -- in

19   the casino -- or, excuse me -- in the hotel?

20   A.  No.

21   Q.  And did you open up any bags?

22   A.  No.

23   Q.  Did you search any of the drawers of any of the -- any

24   of the furniture?

25   A.  No.

1    Q.  So you contacted an investigator?

2    A.  Correct.

3    Q.  And what did that investigator indicate to you?

4    A.  They had me at that time stay in the room for evidence

5    purposes, and they were going to write a search warrant for

6    the room.

7    Q.  And what do you mean stay in the room for evidence

8    purposes?

9    A.  They wanted -- they didn't want anyone going or coming

10   from the room so that nothing could be tampered with.

11   Q.  Was casino security there as well?

12   A.  No.  Once I was advised we were going to do a search

13   warrant, I had security leave the room.

14   Q.  Did you take part in the drafting of the search warrant?

15   A.  I did not, no.

16   Q.  Do you know who drafted the search warrant?

17   A.  Investigator Pamela Hodgden.

18   Q.  And she's with the Leech Lake Police Department?

19   A.  Yes.

20   Q.  Did you speak with her as she prepared a search warrant?

21   A.  She asked me to fill her in.  She made a phone call to

22   me, and I advised her what we had and what was found and --

23   located by myself and security.

24   Q.  And that that was found and located is what you've

25   previously described as you were walking into the bedroom?

1    A.  Correct, yes.

2    Q.  Now, the male and female that was located -- or that

3    were located in the bedroom portion of that suite, did

4    you -- were you able to identify those two individuals?

5    A.  The one we identified by is a Nathaniel -- or Nathan

6    Knotts, K-n-o-t-t-s, and then the other one was actually

7    identified by security.  It was a female, and it was Alexa

8    Wenell I believe she identified herself as.

9    Q.  Did you later learn that Alexia Wenell actually went by

10   another name?

11   A.  Correct.

12   Q.  And what was that?

13   A.  Cutbank would be her last name.

14   Q.  Were you familiar with either Nathaniel or Nathan Knotts

15   or Alexia Wenell or Alexia Cutbank?

16   A.  I knew of them and names -- not the male.  The male was

17   new to me.  But the female, I have heard her name, and she's

18   been in the area.

19   Q.  And that's as of August 5th, 2019, you'd heard of her?

20   A.  Correct, yes.

21   Q.  Had you ever had any interactions with her?

22   A.  I don't recall.

23   Q.  Now, while waiting for the search warrant, you stayed in

24   Room 445?

25   A.  Correct.

1    Q.  Did you search anything while you were waiting for law

2    enforcement -- or excuse me -- while you were waiting for

3    the investigator?

4    A.  No.

5    Q.  How long did you have to wait?

6    A.  I don't believe they showed up until around 9:00 a.m. or

7    close to there.

8    Q.  And during that time, you just stayed in the hotel room?

9    A.  Correct.

10           MS. AANSTAD:  Thank you, Your Honor.  I have no

11   further questions.

12           THE COURT:  Ms. Reuter.

13           MS. REUTER:  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15   BY MS. REUTER:

16   Q.  Good afternoon, Sergeant Hemp.  I'm Donna Reuter.  I'm

17   going to ask you a few questions.

18           So on August 5th, 2019, around 2:00 a.m., you

19   responded to a call at the Cedar Lakes Casino and Hotel;

20   correct?

21   A.  Correct, yes.

22   Q.  And that's in Cass Lake, Minnesota, 6280 Upper Frontage

23   Road?

24   A.  Yes, correct.

25   Q.  And you met hotel security regarding a male that had

1   dropped .357 ammo?

2   A.  Correct.

3   Q.  And that male was Molandas Johnson; correct?

4   A.  Correct.

5   Q.  And hotel security had also indicated to you that they

6   were surveying a Room 445 at the hotel?

7   A.  Correct.

8   Q.  And hotel security relayed to you that there were people

9   going in and out of that room.  That would have been

10  August 4th, that evening, into the August 5th a.m. hours?

11  A.  Correct.

12  Q.  So one of those individuals was Molandas Johnson;

13  correct?

14  A.  Correct.

15  Q.  And then you accompanied security up to the room, and

16  you -- as you were making your way up, you -- they also

17  identified for you a Mia Sumner; is that right?

18  A.  That left the room, yes.

19  Q.  That left the room.  Okay.  So that was --

20  A.  Yes.

21  Q.  So you spoke with Mia Sumner; is that right?

22  A.  Correct.

23  Q.  And she relayed to you that there were others in the

24  room?

25  A.  Yes, correct.

1   Q.  And one of those others was a Montana Cutbank; is that

2   correct?

3   A.  She said a friend at the time I believe.

4   Q.  Okay.

5   A.  I don't think she gave a name.

6   Q.  Also, in your report, I believe, you may have also

7   spoken with a Montana Cutbank who came out of the room.  Do

8   you recall that?

9   A.  The Montana Cutbank that I spoke with was the one that

10  was with Molandas Johnson on the floor of the casino

11  earlier.

12  Q.  Okay.

13  A.  And that's why I recognized him, and they told me that

14  it was him by the garbage can outside.

15  Q.  Okay.  Thank you for that clarification.

16          So you made your way up to the room, and I believe

17  you testified it was around 3:30 a.m. by that point --

18  A.  Correct.

19  Q.  -- that you reached the door?

20          And you entered the room based on security's

21  request to render medical aid?

22  A.  Correct, to help medical.

23  Q.  And the -- you identified two people sleeping in one of

24  the bedrooms of the suite?

25  A.  Correct, yeah.

1   Q.  And neither were responsive at that time?

2   A.  Correct.

3   Q.  You attempted to rouse them or waken them?

4   A.  Yes.

5   Q.  How did you do that?

6   A.  Sternum rub.  It's a technique used.  You can put your

7       knuckles on their sternum and it is pain compliance and

8       finds out if they are -- particularly at that time it was

9       either a possible OD or, you know, alcohol impairment or

10      something.

11  Q.  Okay.  How long approximately did that take to wake them

12      up?

13  A.  If I recall, I had to give them a couple sternum rubs.

14  Q.  So if you can approximate a time maybe, if possible?

15  A.  Usually -- a sternum rub is usually like three, four

16      seconds long.

17  Q.  And you had also called EMTs or medical -- other medical

18      aid; is that right?

19  A.  Yes, along with the ambulance.

20  Q.  So you later were able to identify the woman in the room

21      as Alexia Cutbank?

22  A.  Correct.

23  Q.  Do you recall how you were able to determine her name?

24  A.  An investigator showed me an ID, a photo ID with -- that

25      came off of -- that was on the bed where she was at and then

```
 1    had me look at the photo.
 2    Q.  So there were -- so who exactly found the ID?
 3    A.  Investigator Hodgen, I believe.
 4    Q.  And was he part of the hotel security, or who exactly is
 5    that?
 6    A.  It was the investigator doing the search warrant at the
 7    time once the search warrant was filed or signed by the
 8    judge.
 9    Q.  Okay.  So you identified her after the warrant was
10    executed?
11    A.  Correct.
12    Q.  And -- and how -- how did they do that?
13    A.  They had a search warrant, so they searched the room
14    what was on their search warrant that they had signed, and
15    they found her ID.
16    Q.  So no one looked in any of the -- any of the bags that
17    were in the room prior to that -- to that search warrant
18    being executed?
19    A.  No.
20    Q.  Do you recall there was a black and white Adidas bag on
21    the bed next to Ms. Cutbank?
22    A.  I don't recall that.
23    Q.  Okay.  And there were other bags in the room.  Do you
24    recall, like, other backpacks or purses?
25    A.  There were miscellaneous bags in the room, correct.
```

1    Q.  And you were alone in the room after hotel security had

2    left?

3    A.  Correct.

4    Q.  So, let's see, you had noticed drug paraphernalia within

5    plain view when you entered the room?

6    A.  Correct.

7    Q.  I believe at one point you were advised that the freezer

8    door in the room -- hotel room was open.  Do you recall

9    that?

10   A.  I was advised by security, yes.

11   Q.  Did you look at that refrigerator door yourself?

12   A.  They opened it and I was standing there.  Security

13   opened it.

14   Q.  Okay.  So they opened it.  Did you see what was

15   inside --

16   A.  I did not.

17   Q.  -- the refrigerator?

18         Okay.  So it was not open at the time.  They had

19   to physically open the door?

20   A.  The freezer door?

21   Q.  The freezer door.

22   A.  That the security advised me what was -- what they

23   found, and they said that the door was open.  That's what

24   they advised me, because they were checking for clean -- for

25   the cleaning personnel to come in.  They have to make sure

```
 1        it's safe for the cleaning personnel.

 2        Q.  So just to be clear, they advised you that the door was

 3        open?

 4        A.  I believe so, yes.

 5        Q.  And they opened the door further to inspect the inside

 6        of the freezer?

 7        A.  Yes.

 8        Q.  And did you notice anything in the freezer at that point

 9        in time?

10        A.  A bag.

11        Q.  Okay.

12                MS. REUTER:  No further questions.  Thank you.

13                THE COURT:  Any redirect?

14                MS. AANSTAD:  Nothing, Your Honor.

15                THE COURT:  Ms. Reuter, any reason the witness

16        can't be excused?

17                MS. REUTER:  No, the witness can be excused.

18        Thank you.

19                THE COURT:  Ms. Aanstad?

20                MS. AANSTAD:  No, Your Honor.

21                THE COURT:  After you wipe down the area, you can

22        change the cover on the microphone and then you are free to

23        leave.  Thank you.

24                MS. AANSTAD:  Your Honor, if I may, I'm going to

25        turn on the overhead projection so I can utilize it.
```

 1          THE COURT:  Ms. Aanstad, could you put a new cover

 2     on the mic for me?

 3          MS. AANSTAD:  Yes, Your Honor.  I will do it in

 4     one moment.

 5          Your Honor, if I may, the Government would call

 6     Sergeant Joseph Dejesus.

 7          THE COURT:  Please face the courtroom deputy and

 8     be sworn.

 9       (Witness Sworn.)

10          THE COURTROOM DEPUTY:  Please state your full name

11     and spell your last name.

12          THE WITNESS:  Joseph Dejesus, D-e-j-e-s-u-s.

13          THE COURT:  Please have a seat.  And then once

14     seated, please remove your mask.

15          Ms. Aanstad, you may inquire.

16          MS. AANSTAD:  Thank you.  One moment, Your Honor.

17                         **(Joseph Dejesus)**

18                        **DIRECT EXAMINATION**

19     BY MS. AANSTAD:

20     Q.  Sergeant Dejesus, where are you currently employed?

21     A.  With the Duluth Police Department.

22     Q.  How long have you been with the Duluth Police

23     Department?

24     A.  13 years.

25     Q.  How long have you been a sergeant?

1    A.  Approximately four years.

2    Q.  Do you have any other prior law enforcement experience?

3    A.  No, I don't.

4    Q.  As a sergeant with the Duluth Police Department, what

5    hours do you typically work?

6    A.  5:00 p.m. to 5:00 a.m.

7    Q.  Has that been your routine for the last four years since

8    you've been a sergeant?

9    A.  The last three years.

10   Q.  Excuse me.  Three years.

11        And were you working during the evening into the

12   morning hours, so that 5:00 p.m. to 5:00 a.m., on August --

13   into August 20th, 2019?

14   A.  I was.

15   Q.  And at that time, you were a sergeant?

16   A.  I was.

17   Q.  Now, do you, with the Duluth Police Department, have a

18   particular area that you patrol?

19   A.  I'm currently assigned to the west -- or the western

20   districts for the night shift patrol.

21   Q.  And what does that mean, the western districts?

22   A.  West side of town.

23   Q.  All right.  And on the west side of town, there is

24   Lincoln Park; is that correct?

25   A.  Correct.

```
1    Q.  Now, as a sergeant with the Duluth Police Department,

2    you have a patrol unit?

3    A.  I do.

4    Q.  And do you regularly patrol the streets as well?

5    A.  I do.

6    Q.  And you're in uniform?

7    A.  I am.

8    Q.  Now, let's talk specifically about August 20th of 2019.

9    Were you in the Lincoln Park area in the early morning hours

10   shortly after midnight?

11   A.  I was.

12   Q.  And had you responded to a call in that area?

13   A.  Yes.

14   Q.  What was the nature of that call?

15   A.  We were investigating a drive-by shooting.

16   Q.  And when you say we were investigating a drive-by

17   shooting, who is that?

18   A.  Myself and other officers assigned to the -- to the

19   patrol crew.

20   Q.  How long -- well, let me back up for a second.  When you

21   say that you were investigating a drive-by shooting,

22   specifically where was that area at?

23   A.  It was at the -- near the intersection of 24th Avenue

24   West and West 3rd Street.

25   Q.  Now, on your screen I'm going to show you Government
```

1    Exhibit 5.  It's already been admitted into evidence.  Do

2    you recognize this area?

3    A.  I do.

4    Q.  And what is this area?

5    A.  That's a -- the intersection of 24th Avenue West and

6    West 3rd Street in the Lincoln Park neighborhood of Duluth.

7    Q.  Now, I think your screen has writing capabilities and

8    you can mark for the Court the intersection that you are

9    talking about.

10   A.  Is it a touch screen?

11   Q.  It is.

12   A.  This is approximately the area that we were focused on

13   during our investigation (indicating).  And that's the area

14   of that previously-mentioned intersection (indicating).

15   Q.  Now, that area, as you were investigating -- again, how

16   long were you at that area investigating that drive-by

17   shooting?

18   A.  Approximately an hour and a half.

19   Q.  And as part of that investigation, there were multiple

20   officers at the scene?

21   A.  There were.

22   Q.  And you all were doing work with respect to that

23   drive-by shooting?

24   A.  Correct.

25   Q.  Now, at approximately 2:30 or slightly before 2:30 a.m.,

1   were you wrapping up that drive-by shooting scene?

2   A.  I was.

3   Q.  And by wrapping up that scene, what were you doing?

4   A.  We were taking down the crime scene tape.  I was giving

5   officers tasks to complete up that investigation so they

6   could clear from the area and continue on with their shift.

7   Q.  And you were one of the supervising officers at the

8   scene?

9   A.  I was.

10   Q.  And so you were assigning tasks to other officers?

11   A.  Yes.

12   Q.  And there had been crime scene tape that had been put up

13   around that intersection?

14   A.  Yes.

15   Q.  Now, so shortly before 2:30 a.m., you were about ready

16   to clear that scene?

17   A.  I was.

18   Q.  And was there any observations that you made in that

19   area as you were standing there?

20   A.  Yes.  As I was closing that scene down and taking the

21   tape down, I observed a -- what appeared to me to be --

22   appeared to me to be about a 15-year-old female standing at

23   the southwest corner of the intersection inside the bus

24   stop.

25   Q.  So if you can on Government Exhibit 5, can you mark

1    where that bus stop is?

2    A.  That would be right there (indicating).

3    Q.  Now, if you can, explain to the Court what type of bus

4    stop that is?

5    A.  It's a clear glass enclosure, a little vestibule type

6    thing with a bench in it.

7    Q.  Was there anyone else at the corner of 24th and 3rd at

8    that time?

9    A.  No.

10   Q.  How many officers were in that area still?

11   A.  I would -- if I had to guess, four or five maybe.  I'm

12   not 100 percent on how many were left.

13   Q.  Okay.  You were getting ready to clear the scene?

14   A.  Correct.

15   Q.  Why did that individual catch your attention who was

16   standing in the bus stop?

17   A.  At 2:00 in the morning, high-crime neighborhood, she

18   appeared to be underage.  Just seemed out of place.  I was

19   worried about her safety.

20   Q.  Now, you'd been at that area at that intersection for

21   about an hour and a half at that point in time?

22   A.  Correct, back and forth, yeah.

23   Q.  And back and forth, what do you mean by that?

24   A.  That intersection and kind of the -- we had a couple

25   different scenes on that shooting.

1    Q.  Okay.

2    A.  So I was going between the different locations.

3    Q.  And when you say going between those different

4    locations, would you go in your squad car or would you go --

5    A.  Yes, in my squad car.

6    Q.  Okay.  And you'd been to that intersection, though,

7    multiple times in that hour and a half?

8    A.  Yes.

9    Q.  Had you ever seen that female at that bus stop during

10   that time that you were at the scene?

11   A.  No, I didn't.

12   Q.  And what did you do once you saw that female in the bus

13   stop or vestibule?

14   A.  Approached her on foot to check on her.

15   Q.  Why?

16   A.  Again, late at night, high-crime area.  She appeared to

17   be very young.

18   Q.  Did you recognize the female?

19   A.  No, I did not.

20   Q.  Did the female -- when you -- so you approached the bus

21   stop?

22   A.  I did.

23   Q.  On foot?

24   A.  Yes.

25   Q.  At that time, where was your squad parked?

1    A.  On the photo here, I was parked just west of the bus

2    stop.  Kind of right about by that little line there

3    (indicating) on the shoulder of the road.

4    Q.  And what did you -- explain your approach to the bus

5    stop.

6    A.  How I approached the bus stop?

7    Q.  Right.

8    A.  I -- again, I was -- I was actually removing crime scene

9    tape at the time from the intersection, and I just -- I

10   walked up to it on foot.

11   Q.  And was there anyone else besides this female in the bus

12   stop?

13   A.  No.

14   Q.  What was the demeanor of the female at the time?

15   A.  She appeared frightened or nervous.  She was just

16   constantly looking around, looking over her shoulders, kind

17   of moving her arms about, clenching her hands, and her

18   entire body appeared to be trembling.

19   Q.  What did you think?

20   A.  My first impression was that she was under the influence

21   of possibly methamphetamine.

22   Q.  Were you concerned about her at that time?

23   A.  I was.

24   Q.  Why?

25   A.  Young female under the influence out on the street at

1    2:00 in the morning, I was worried for her safety.

2    Q.  Now, as you approached her, did you interact with her,

3    make -- or contact her verbally?

4    A.  I did.

5    Q.  What did you do?

6    A.  Well, I initial- -- I went up to check on her.  I also

7    had asked her if she'd seen anything related to what we

8    were -- we were investigating, and she hadn't.  She -- she

9    inquired about what all the police were doing there.  And

10   then, again, she just -- she kept, again, looking over her

11   shoulder, looking around.  So I asked her if she wanted to

12   sit in my squad car, and she did.

13   Q.  Why did you ask her to sit in your squad car?

14   A.  She looked scared.  I thought that might put her at ease

15   a little bit.  She looked like she was looking for -- the

16   way she kept looking over her shoulders, I didn't know if

17   she thought there was somebody coming after her.

18   Q.  Did the female agree?

19   A.  She did.

20   Q.  Now, at that point in time, had you identified who the

21   female was?

22   A.  I had not.

23   Q.  And, again, you'd never seen her before?

24   A.  No, not that I can recall.

25   Q.  You didn't know name, age --

1    A.  No.

2    Q.  -- where she was from?

3    A.  No.

4    Q.  Did the female agree to go to your squad car?

5    A.  She didn't verbally agree.  But when I asked her to have

6    a seat in my squad car, she just quickly walked directly

7    towards it.

8    Q.  Did you explain why you wanted her to sit in the squad

9    car?

10   A.  I did not.

11   Q.  So the -- this female went to your squad car?

12   A.  She did.

13   Q.  And explain what happened when you got to your squad car

14   with her.

15   A.  So I opened the door.  She had a seat in the back.  I

16   closed the door and completed some other tasks that I was

17   doing related to the original investigation as far as just

18   giving out assignments, et cetera, throwing some garbage

19   away, and then I reapproached the squad car to speak with

20   her.

21   Q.  When you had her sit in your squad car, where did she

22   sit in your squad car?

23   A.  She sat in the rear driver's side.

24   Q.  Did you -- did you search her before putting her in the

25   back of your squad car?

```
1    A.  I did not.

2    Q.  Why not?

3    A.  I had no reason to.  I didn't believe she was involved

4    in any type of criminal activity.  I wasn't able to

5    articulate that she would have anything on her or any

6    weapons.

7    Q.  And when you placed her into the back of the squad car,

8    you said you shut the door?

9    A.  I did.

10   Q.  Did you explain to her at that point in time why she was

11   in the back of your squad car?

12   A.  I did not.

13   Q.  What was your plan?  What were you going to do with this

14   girl in the back of the squad car?

15   A.  Like I said, I initially thought she was 15, 16 years

16   old.  Needed to figure out where she needed to be.  I

17   thought she was possibly under the influence of

18   methamphetamine, so I needed to find a safe place for her to

19   go.

20   Q.  You said you finished some tasks and then went back to

21   your squad car?

22   A.  Yes.

23   Q.  What happened when you went back to your squad car?

24   A.  I began asking her what she was doing in the

25   neighborhood, who she was.  She was being very vague with
```

1    her answers, really not telling me much.

2              And I asked her -- I asked her about drug use.

3    She admitted to using methamphetamine a few days prior, and

4    that at one point she said she was trying to get back to Red

5    Lake.  When I asked her where she was currently, she wasn't

6    able to tell me.

7              I had mentioned -- I told her where she was.  She

8    was in Duluth.  I asked if she knew anybody in the area.

9    She said she did not.  And then at one point in our

10   conversation, I had asked her how she got to Duluth, and she

11   said she stole a vehicle.

12   Q.  Now, you wear a body camera; is that correct?

13   A.  I do.

14   Q.  And you have the ability to turn it on and off?

15   A.  I do.

16   Q.  And that evening in those early morning hours of

17   August 20th, 2019, were you wearing a body camera?

18   A.  I was.

19   Q.  Now you've had an opportunity to review what's been

20   marked and offered as Government Exhibit 4.  That is body

21   camera video; is that correct?

22   A.  Correct.

23   Q.  And you had approximately a 4-minute-and-48-second

24   conversation with the woman or the female that you found in

25   the bus stop?

1    A.  Correct.

2    Q.  And that body camera video captures from the moment that

3    you went back to your vehicle; is that correct?

4    A.  Correct.

5    Q.  And, to be clear, back to your vehicle after she --

6    after the female had already been placed in the back of the

7    vehicle?

8    A.  Yes.

9    Q.  And at that time when you put her into the back of the

10   vehicle, she wasn't in custody?

11   A.  She was not.

12   Q.  Had you planned on taking her to the jail?

13   A.  No.

14   Q.  Had she committed any crime at that point in time?

15   A.  No.

16   Q.  Now, during that conversation, after she indicated that

17   she had stole a car, did she provide further information as

18   you were trying to talk to her about why she was in Duluth?

19   A.  She did.

20   Q.  What did she tell you?

21   A.  Well, she had -- she had said she stole a car, and then

22   I asked her about that.  And she eventually said she stole

23   it from Fat Back and that she had shot him.

24   Q.  What did you do once you heard that information from the

25   female?

```
1    A.  Then at that point, I removed her from the vehicle and

2    patted her down to see if she had any weapons on her.

3    Q.  Why did you do that?

4    A.  She had told me she didn't, but she's kind of making

5    some strange statements there, so I thought, so I wasn't

6    sure.  I took her out just to make -- for safety just to

7    make sure she didn't have anything.

8    Q.  Did you believe this female as she was telling you about

9    shooting someone?

10   A.  I did not.

11   Q.  Why not?

12   A.  I believed it was kind of just her paranoia, kind of a

13   meth-induced paranoia.  It just -- I was looking at a

14   younger female there, and I just wasn't buying the

15   statements.  I hadn't heard -- typically if there's a --

16   there's a homicide in northern Minnesota with outstanding

17   suspects, we're going to get a cops alert or a BOLO alert on

18   our squad computers.  I just hadn't heard about anything

19   like that occurring.

20   Q.  About a murder that occurred at Red Lake?

21   A.  Yes.

22   Q.  Now, what happened after -- did you find any weapons on

23   this woman?

24   A.  I did not.

25   Q.  Did you ask the female her name?
```

1    A.  I did.

2    Q.  And she provided you a name?

3    A.  She gave me the name of Mia Sumner.

4    Q.  Were you familiar with a Mia Sumner?

5    A.  No.

6    Q.  And what did you do after you took Mia Sumner out of

7    your vehicle?

8    A.  I requested another officer that was on scene to

9    transport her to the hospital as I believed she was under

10   the influence of methamphetamine.

11   Q.  And why transport to the hospital then?

12   A.  Just I didn't know at that point where -- where --

13   excuse me.  Pardon me.  I didn't know at that point where I

14   was going to take her, whether it was going to be returning

15   home, you know, to a juvenile facility, or what.  But

16   wherever I was going to take her, I needed her to be

17   medically cleared before I brought her there, just to make

18   sure that medically she was okay, that she was safe.

19   Q.  And, again, as you're speaking with this female that's

20   identified herself as Mia Sumner, you thought she was a

21   juvenile female?

22   A.  I did, yes.

23   Q.  And would you treat a juvenile differently than if this

24   would have been an adult female?

25   A.  Yes.

1   Q.  Explain.

2   A.  Any juvenile facility I bring her to -- or I -- any

3   juvenile facility we bring a juvenile to, if they appear to

4   be under the influence of drugs or alcohol, they are going

5   to want -- the facility will want that juvenile medically

6   cleared first.  They don't want to take on that liability.

7   They want to make sure that the juvenile is stable before

8   they are brought inside.

9   Q.  And let me ask another question with respect to why

10  didn't you let -- even if you thought she was a juvenile

11  female that was under the influence of methamphetamine, why

12  didn't you just let her go?

13  A.  I'm not going to let a juvenile female just walk away in

14  the middle of the night.  I worry about her safety,

15  especially in that area.  Kind of in that vicinity, we have

16  another facility in town called the Sol House for at-risk

17  females, females at risk of -- at risk or victims of human

18  trafficking.  We frequently have runaways from that

19  facility, and I didn't know if she was potentially coming

20  from there.  Either way, it's 2:00 in the morning with a

21  young female.  I wouldn't feel comfortable sending her

22  walking on the streets.

23  Q.  What if you would have believed that she was a

24  25-year-old female?

25  A.  If she is under the influence of meth or if she is

1    intoxicated to where she can't care for herself, I'm still

2    going to -- I'm going to assess that.  If I feel that she

3    can't care for herself, I would have done the same thing,

4    take her to the hospital to be medically cleared or to sober

5    up.

6    Q.  Now, the woman -- or the female that identified herself

7    as Mia Sumner hadn't committed a crime on August 20th, 2019?

8    A.  Correct.

9    Q.  Yet you were going to have an officer take her to the

10   hospital?

11   A.  Correct.

12   Q.  Now, before we talk further, while you were talking to

13   her in that little more than four minutes, what was her

14   demeanor like?

15   A.  Just seemed very nervous, constantly looking around.

16   Seemed to be just her arms were moving around.  She was

17   clenching her fists.  She didn't seem to be in control of

18   her motor movements.

19   Q.  Did she appear to be tracking with the questions that

20   you were asking?

21   A.  She did.

22   Q.  And she responded appropriately when you asked her what

23   her name was?

24   A.  She did.

25   Q.  Now, after you called the other officer over to take the

1    individual that was identified -- or the female who

2    identified herself as Mia Sumner, what happened next?

3    A.  I checked the name Mia Sumner in our records management

4    system, and then I came up with a full name and date of

5    birth for her.  Found out she was 18 and had a couple of

6    outstanding juvenile warrants for her arrest.  I also found

7    recent history with her where she had been reported as a

8    runaway or missing person in Duluth and then recovered on

9    August 19th in Duluth as well.

10   Q.  Now, where was Mia Sumner at at the time that you were

11   finding all of this information out?

12   A.  She would have either been walking to Officer

13   Leibfried's vehicle or already in the back of his vehicle

14   but still on scene or still in the area.

15   Q.  Now, at that point in time, with those warrants that

16   were active, would you -- or did you arrest Mia Sumner?

17   A.  We never placed her in handcuffs or told her she was

18   under arrest, no.  But at that point, once I found out the

19   warrants, she was under arrest.

20   Q.  Did you have any other interaction with Mia Sumner after

21   Officer Leibfried took her to his vehicle?

22   A.  I did not.

23   Q.  Now, when Mia Sumner provided you that information about

24   killing Fat Back, did you believe that information on August

25   20th, 2019?

1    A.  I did not.

2    Q.  And, again, we discussed it, but you hadn't heard

3    anything about a murder that had occurred on Red Lake?

4    A.  I hadn't heard anything about a murder or anything like

5    that.  And then also when I looked up the history on her

6    name, especially considering in her statement to me she knew

7    nobody in Duluth and didn't know where she was, but in our

8    records management system, it showed that just a day prior,

9    she had been recovered in Duluth as a runaway.  She had been

10   entered as a runaway from Duluth.  I -- you know, she had --

11   she had St. Louis County warrants for her arrest that

12   indicated to me that she was from the area.  So it just kind

13   of further reinforced my belief that her statement wasn't

14   making any sense.

15   Q.  Now, after your interaction with Mia Sumner on

16   August 20th, 2019, did you have an opportunity to learn

17   further information about a murder that occurred at Red

18   Lake?

19   A.  I did.

20   Q.  Describe, please.

21   A.  So my -- my shift ended on the 20th at 5:00 a.m.  I

22   work -- at that time, we worked four days on and four days

23   off.  That was my third day of the rotation.  I came back to

24   work on the 20th at night for my final day of my rotation.

25   And then at -- on the 21st at 5:00 a.m., when I was being

1    relieved by the incoming sergeants, at that time we brief

2    each other on what had occurred during the week.  I was

3    relaying the information about the drive-by shooting that we

4    had been investigating, and I mentioned Mia Sumner, the

5    female I had found at the end of that shooting who claimed

6    that she had shot a guy and stole his car.  I told that

7    sergeant, it actually -- I told him that she told us this

8    and just I didn't believe it.  It was almost kind of a funny

9    story, if you will.  And he then tells me that in the

10   newspaper that morning there was an article about a murder

11   on Red Lake.

12   Q.  What did you do in response to that?

13   A.  I contacted the Red Lake PD.  The officer I spoke with,

14   I don't know if he wasn't involved in the investigation or

15   what.  He didn't really want to give me any information.  He

16   took down my contact information though.

17   Q.  And did you hear anything else from anyone over at Red

18   Lake?

19   A.  A couple hours later I received a phone call from the

20   FBI who told me they were investigating a murder on the

21   reservation.  And I passed on the information on my contact

22   with Ms. Sumner and advised them that she was currently at

23   the Arrowhead Juvenile Center under arrest on a couple

24   warrants.

25              MS. AANSTAD:  Thank you, Sergeant Dejesus.  I have

1    no other questions.

2              THE COURT:  Ms. Elkins, cross?

3                        **CROSS-EXAMINATION**

4    BY MS. ELKINS:

5    Q.  Sergeant Dejesus, is methamphetamine a problem in

6    Duluth?

7    A.  It is.

8    Q.  And do you encounter people high on meth with some

9    regularity?

10   A.  With some regularity, yes.

11   Q.  Okay.  And how can you tell if someone is high on

12   methamphetamine?

13   A.  Typically, they present as being nervous, very -- very

14   jittery, constantly moving around, looking around, have a

15   hard time controlling their motor movements.  Kind of their

16   arms flailing, their hands clenching, unclenching, things

17   like that.

18   Q.  And was Ms. Sumner kind of exhibiting all those telltale

19   signs?

20   A.  She was.

21   Q.  Okay.  Now, your report was written on August 20th,

22   2019.  Did you do it after your shift ended at 5:00 a.m.?

23   A.  I didn't write my report until August 25th when I

24   returned from my days off.

25   Q.  Okay.  So about five days later?

1    A.  Correct.

2    Q.  Had you reviewed your body cam video on August 25th when

3    you wrote the report?

4    A.  I did.

5    Q.  Okay.  And still that was about two and a half years

6    ago; right?

7    A.  Correct.

8    Q.  How many people do you arrest every year?

9    A.  That would be -- I couldn't tell you.

10   Q.  Over 100?

11   A.  When I was a patrol officer, yes.  As a sergeant, no,

12   probably not that many.

13   Q.  Okay.  Would you say you encounter at least 100 people a

14   year even if you don't arrest them?

15   A.  Yes.

16   Q.  Okay.  And you were a sergeant back in 2019?

17   A.  I was.

18   Q.  Okay.  So you wrote your report just five days after

19   having this encounter with Mia Sumner.  Do you believe that

20   five days after the event your mind was probably fresher

21   then than two and a half years later after the event?

22   A.  I do.

23   Q.  Okay.  And in preparing for today's hearing, were you

24   able to review your report?

25   A.  I did.

```
 1    Q.  And were you able to review the body camera footage?

 2    A.  I was, yes.

 3    Q.  Okay.  And so did that help you fresh your recollection

 4    somewhat?

 5    A.  It did, yes.

 6    Q.  But still your report would probably be a more reliable

 7    rendition of your -- of what you believed happened on

 8    August 20th, 2019?

 9    A.  Yes.

10    Q.  Okay.

11         MS. ELKINS:  Your Honor, we would move to enter

12    the two-page report written by Sergeant Dejesus on

13    August 25th, 2019, as Sumner Defense Exhibit 1.

14         THE COURT:  Ms. Aanstad?

15         MS. AANSTAD:  No objection.

16         THE COURT:  Defense Exhibit -- Sumner Exhibit 1 is

17    admitted.

18         MS. ELKINS:  Thank you, Your Honor.

19    BY MS. ELKINS:

20    Q.  Sergeant, you said at one point that you put Ms. Sumner

21    in the back of the squad and then shut the door?

22    A.  I did.

23    Q.  And where did you go at that point?

24    A.  I crossed the street throwing some garbage away,

25    throwing the crime scene tape into a garbage can, and then I
```

Sumner - Cross - Johnson

1    had a conversation with some of the other officers about

2    things that needed to be completed related to the

3    investigation we were on.

4    Q.  Okay.  And you said there were still about four or five

5    officers in the area?

6    A.  I believe so.

7    Q.  And how many squads were still there?

8    A.  There would have been four or five.  Each officer has

9    their own squad car.

10   Q.  Okay.  So you were kind of sending people to go patrol

11   and do other stuff after you're wrapping up the scene?

12   A.  Correct.

13   Q.  Okay.  When you do go back to Ms. Sumner, you open the

14   door for her in the back; correct?

15   A.  Yes.

16   Q.  Can someone sitting in the back of your squad, is there

17   a handle inside?  Can they -- can they open the door?

18   A.  There's no handle.  They can't open it from the inside,

19   not in the back.

20   Q.  Okay.  So you open the back door right where she's

21   sitting to speak with her at that point?

22   A.  Yes.

23   Q.  But you didn't run her name yet; correct?

24   A.  Correct.

25   Q.  And at first, as you can see in the video, you ask her

1    some questions, but she doesn't really answer; correct?

2    A.  No.

3    Q.  So you ask her more questions, and eventually she

4    started to give you some mumbling answers?

5    A.  Correct.

6    Q.  But she was being pretty vague?

7    A.  She was.

8    Q.  And, again, her physical mannerisms in the video, it

9    seems like she's high on meth?

10   A.  I believe she was impaired, yes.

11   Q.  Okay.  Her speech was a little slow?

12   A.  A little slow.  A little quiet maybe.

13   Q.  And you asked her about using methamphetamine?

14   A.  I did.

15   Q.  And she admitted but she said it had been much earlier;

16   correct?

17   A.  She said a few days ago.

18   Q.  Okay.  But you had reason to believe she had used

19   recently?

20   A.  Typically when I'm speaking with somebody who is under

21   the influence of -- whether it be drugs or alcohol, they are

22   not completely honest with how much they have used or how

23   recently.

24   Q.  Okay.  And because of the way she was acting and

25   responding, you asked her if she even knew where she was;

Scott - Cross-Schroeder-LIB

1    correct?

2    A.  Correct.

3    Q.  And she responded that she didn't know?

4    A.  Correct.

5    Q.  And that's when you had the conversation about whether

6    or not she knew anyone in Duluth?

7    A.  Yes.

8    Q.  And you asked her how she got to Duluth?

9    A.  I did.

10   Q.  And she told you she stole a car?

11   A.  She did.

12   Q.  She said she stole her car; right?

13   A.  When I asked her whose car she stole, she said her car.

14   Q.  Okay.  And then you asked her, Well, how do you steal

15   your own car?  And she replied, It wasn't my car.  I killed

16   Fat Back?

17   A.  I believe that was -- yeah, I believe that was her exact

18   phrasing.

19   Q.  Okay.  And then you asked, How did you kill Fat Back?

20   A.  I did.

21   Q.  And she responded, With a gun?

22   A.  Yes.

23   Q.  You asked, Where is the gun?  And she responded, I don't

24   know.

25   A.  She said she didn't know, and then she made a statement

1    that it was in Red Lake.

2    Q.  Okay.  So she kind of just clarified, I don't know.

3    It's in Red Lake somewhere, or something like that?

4    A.  Correct.

5    Q.  Okay.  And based on this, you asked her to hop out of

6    the squad car so you could check her for weapons?

7    A.  Correct.

8    Q.  And she complied?

9    A.  She seemed a little hesitant to step out at first, but I

10   kind of told her, Come on out, and she did.  We didn't have

11   to pull her out of the car or anything.

12   Q.  And when she hops out of the squad car, there's another

13   officer standing there?

14   A.  Yes.

15   Q.  Is that Officer Leibfried?

16   A.  No.  That was Officer Taheri.

17   Q.  Okay.  But it was Officer Leibfried you asked to

18   transport her to St. Luke's Hospital?

19   A.  Correct.

20   Q.  Okay.  After she hopped out and you frisked her, you

21   placed her back into your squad?

22   A.  I did.

23   Q.  And then you questioned her further about the identity

24   of Fat Back?

25   A.  I did.

```
 1    Q.  And she told you Fat Back is Daniel Johnson?

 2    A.  Yes.

 3    Q.  Okay.  And based on her condition, you didn't believe

 4    her story at the time?

 5    A.  I did not.

 6              MS. ELKINS:  Thank you.  No further questions.

 7                    REDIRECT EXAMINATION

 8    BY MS. AANSTAD:

 9    Q.  Just briefly, Sergeant.  Looking -- we've still got

10    Government Exhibit 5 up.  There were other officers at the

11    scene with squad cars; right?

12    A.  Correct.

13    Q.  And were the squad cars all bunched together near your

14    squad car on Third?

15    A.  There were several near my squad car, and then there

16    were also cars on the other side of the intersection.

17    Q.  Okay.  And during your interaction -- initial

18    interaction with Ms. Sumner, were there other officers that

19    were standing next to you?

20    A.  No.

21    Q.  What about -- and I guess I should clarify that for the

22    record.  When you are at the bus stop, there were no other

23    officers that went to the bus stop with you?

24    A.  Not that I recall, no.

25    Q.  What about when you transferred or led Ms. Sumner to
```

1    your vehicle?

2    A.  I don't recall there being any other officers there.

3    Q.  Were you, you know, directing anyone to come over and

4    help you out?

5    A.  No, not at that point.

6    Q.  And in that squad video that we see in Government

7    Exhibit 4, was there an officer that was standing next to

8    you as you were talking with Ms. Sumner?

9    A.  Sorry.  In the body cam video?

10   Q.  Yes.

11   A.  When I was talking to her, no.  When she started talking

12   about the gun, I had called Officer Taheri over.  I could

13   still see him in the area, so I called him over to my -- to

14   my location.

15   Q.  And why did you do that?

16   A.  Because I was going to remove her from the squad car and

17   do a check for weapons.  Just in case there was a weapon, I

18   would want another officer there to hand that off to when I

19   removed it from her.

20   Q.  Now, when -- again, when you placed Ms. Sumner -- or

21   when you -- when she went over to your vehicle the first

22   time and you placed her in the backseat, at that time was

23   she under arrest?

24   A.  No.

25   Q.  Did you know that she'd committed any crime?

```
 1    A.  No.

 2    Q.  And did you search her?

 3    A.  No.

 4    Q.  Now, you were asked a lot of questions on

 5    cross-examination about indications that someone is on

 6    methamphetamine?

 7    A.  Yes.

 8    Q.  Could there be other explanations for the demeanor that

 9    you saw in Ms. Sumner on August 20th, 2019?

10    A.  There could.

11    Q.  Like what?

12              MS. ELKINS:  Objection.  Calls for speculation.

13              MS. AANSTAD:  I'll ask another question.

14              THE COURT:  Sustained.  Is there foundation you

15    can lay?

16              MS. AANSTAD:  I'll ask another question,

17    Your Honor.

18              THE COURT:  Okay.

19    BY MS. AANSTAD:

20    Q.  Now, again, on August 20th, 2019, you didn't know about

21    a murder that had occurred on Red Lake?

22    A.  Correct.

23    Q.  You didn't know Ms. Sumner?

24    A.  Correct.

25    Q.  And it was only after your interaction that you later
```

1   learned that there was a murder at Red Lake?

2   A.  Correct.

3   Q.  Do you know any facts about that murder from Red Lake?

4   A.  I do not.

5          MS. AANSTAD:  Thank you.  I have no further

6   questions.

7          THE COURT:  Ms. Elkins?

8          MS. ELKINS:  Nothing further.

9          THE COURT:  Any reason the witness shouldn't be

10  excused?

11         MS. ELKINS:  No, Your Honor.

12         THE COURT:  Ms. Aanstad?

13         MS. AANSTAD:  No, Your Honor.

14         THE COURT:  All right.  Sergeant, if you would

15  clean up the area as you were instructed and then replace

16  the cover on the microphone.  Once that's done, you're free

17  to leave.

18         THE WITNESS:  Thank you.

19         THE COURT:  Ms. Aanstad, any other witnesses?

20         MS. AANSTAD:  No, Your Honor.  The Government

21  rests.

22         THE COURT:  Ms. Elkins?

23         MS. ELKINS:  No witnesses, Your Honor.

24         THE COURT:  Defense rests?

25         MS. ELKINS:  Defense rests.

1          THE COURT:  All right.  Mr. Zayed, I didn't ask

2     you before but relative to your motions on the search

3     warrant, does the defense rest?

4          MR. ZAYED:  Yes, Your Honor.

5          THE COURT:  All right.  Any change in the briefing

6     schedule based on anything you heard today?

7          MS. AANSTAD:  No, Your Honor.

8          MR. ZAYED:  No, Your Honor.

9          MS. ELKINS:  No, Your Honor.

10          THE COURT:  All right.  So the defendants are

11     going to jointly, I suppose, order a transcript or -- yep.

12          MS. ELKINS:  Based on what I've learned earlier,

13     Your Honor, my office will order them.

14          THE COURT:  Okay.  14 days from the court

15     reporter, the -- once the transcript is received, both

16     defendants will have two weeks, 14 days following receipt to

17     file their memorandums relative to their respective motions

18     to suppress.  Once the Government has received all defendant

19     memorandums, the Government will have two weeks to respond

20     to the two motions to suppress.  14 days, two weeks,

21     14 days.

22          All right.  Anything else today?

23          MS. AANSTAD:  No, Your Honor.

24          THE COURT:  Mr. Zayed?

25          MR. ZAYED:  No, Your Honor.

1          THE COURT:  Ms. Elkins?

2          MS. ELKINS:  No, Your Honor.

3          THE COURT:  All right.  We're adjourned.  Thank

4     you.

5          (Court adjourned)

6                              *      *      *

7

8

9          I, Erin D. Drost, certify that the foregoing is a

10    correct transcript to the best of my ability from the

11    official digital recording in the above-entitled matter.

12

13              Certified by:  *s/ Erin D. Drost*

14                             Erin D. Drost, RMR-CRR

15

16

17

18

19

20

21

22

23

24

25